**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____
                                                    )
**UNITED STATES OF AMERICA**          )
                                                    )          **Criminal No.**
            **v.**                                  )          **18-10248-FDS**
                                                    )
**RAYMOND SCANZANI,**                  )
                                                    )
            **Defendant.**                      )
_____)


## MEMORANDUM AND ORDER ON MOTION TO SUPPRESS

**SAYLOR, J.**

Defendant Raymond Scanzani is charged with possession of child pornography in

violation of 18 U.S.C. § 2252A(a)(5)(B). He has filed a motion to suppress evidence seized by

the government from his apartment. Scanzani alleges that the search and seizure violated the

Fourth Amendment of the United States Constitution because the warrant (1) was not supported

by probable cause and (2) was overbroad and did not describe the items to be seized with

particularity. In addition, Scanzani alleges that the government's search of his attic, which

resulted in the seizure of a story that he had written, exceeded the scope of the warrant.

## I.      Background

### A.      Factual Background

In December 2006, Raymond Scanzani was convicted in the United States District Court

for the Southern District of Florida of (1) one count of knowingly mailing and transporting and

attempting to mail and transport child pornography by use of a computer in violation of 18

U.S.C. § 2252A(a)(1), (2) one count of receiving child pornography by means of a computer in

violation of 18 U.S.C. § 2252A(a)(2)(B), and (3) one count of possession of child pornography

by means of a computer in violation of 18 U.S.C. § 2252A(a)(5)(B).  *United States v. Scanzini*, No. 06-cr-60185 (S.D. Fla. 2006).[1]  He was sentenced to a prison term of 96 months to run concurrently, followed by a lifetime term of supervised release.

In addition to the standard conditions of release, the court ordered a series of special conditions.  Among other things, the court ordered that Scanzani would be prohibited from "possess[ing]" any "visual depictions of minors or adults engaged in sexually explicit conduct," and "accessing via computer any 'material' that relates to . . . possession of child pornography." (Conditions of Probation and Supervised Release at 4-5).  The court also ordered that he "shall submit to a search of his/her person or property in a reasonable manner and at a reasonable time by the U.S. Probation Office." (*Id*.).  Condition (h) further provided that he

> shall submit to the U.S. Probation Officer conducting periodic unannounced examinations of [his] person, property, house, residence, vehicles, papers, computer(s), other electronic communication or data storage devices or media, include [*sic*] retrieval and copying of all data from the computer(s) and any internal or external peripherals and effects at any time, with or without warrant by any law enforcement or probation officer with reasonable suspicion concerning unlawful conduct or a violation of a condition of probation or supervised release. The search may include the retrieval and copying of all data  from the computer(s) and any internal or external peripherals to ensure compliance with this condition and/or removal of such equipment for the purpose of conducting a more thorough inspection; and to have installed on the defendant's computers) [*sic*], at [Scanzani's] expense, any hardware or software systems to monitor [his] computer use.

(*Id*.).

Scanzani's term of supervised release began on June 18, 2013.[2]  On October 5, 2016, Scanzani's probation officer gave him permission to own and use a computer at his home.  On October 2, 2017, the probation department installed the monitoring software RemoteCOM on his

---

[1] Scanzani was convicted under the name "Scanzini," although his true name appears to be "Scanzani."

[2] Scanzani's supervision was transferred to the District of Massachusetts on February 14, 2014.

computer.  RemoteCOM monitors a user's computer activities and applies specific "trigger" words applicable to the user's offense.  Once a "trigger" word is detected, the system conducts an initial review of the computer activity that may constitute a violation and refers it to the offender's probation officer for further review.  A probation officer can also independently review the offender's activity.

On May 25, 2018, RemoteCOM notified the probation department that monitoring had discovered notable information in the screenshots data field recorded from Scanzani's computer.  On June 6, 2018, RemoteCOM provided a report on the activity that it had detected to the probation department.  Homeland Security Investigations ("HSI") Special Agent Jason Defreitas reviewed the report, which consisted of approximately 34 PDF documents of images from Scanzani's computer.

On June 27, 2018, Defreitas submitted an application to Magistrate Judge Cabell for a warrant to search Scanzani's person and home.  The application included a supporting affidavit from Defreitas.  The affidavit provided background information concerning Scanzani's criminal history and the current investigation.  Among other things, Defreitas submitted three photographs from the RemoteCOM report that he opined "depict[ed] minors engaged in sexually explicit conduct based on the lascivious exhibition of their genitals."  (Affidavit of Defreitas, ¶ 5g).

In his affidavit, Defreitas attested that the RemoteCOM report "consist[ed] of approximately 34 pdf documents containing images from S[canzani]'s computer."  (*Id.* ¶ 5d).  Those documents, Defreitas attested, contained "screenshots of a narrative story, actively being edited by S[canzani] [that] involv[ed] the sexual molestation of infants, toddlers and young boys."  (*Id.* ¶ 5e).  Defreitas included the first sentence of the story, which read, "He realized it was absolutely necessary to gain the boy's trust, and begin to form a loving bond with him

before he could begin the first stages of total molestation." (*Id.*). The story was apparently written in a distinctive font that Defreitas believed matched the font Scanzani had used in his monthly supervision reports to probation. (*Id.*).

In addition, Defreitas attested that the report "contain[ed] numerous images of infants and prepubescent children either fully naked or partially naked with their genitals exposed." (*Id.* ¶ 5f). In particular, Defreitas described the three photographs he had submitted to the magistrate judge:

> i. In the file titled CumulativeDetail-34.pdf is an image denoted DSC_0051 of a naked infant boy approximately 1-3 years old with legs spread wide. The photo shows the boy from the mid-torso down, and the focal point of the photo is on the boy's genitals.
>
> ii. In the file titled CumulativeDetail-33.pdf is an image of a naked boy approximately 3-6 years old standing with one leg and his genitals propped up on a container. The boy is holding a banana.
>
> iii. In the file titled CumulativeDetail-32.pdf is an image denoted DSC_0008 of a boy approximately 3-6 months old, naked from the waist down lying on his side with his shirt pulled up and his genitals exposed.

(*Id.* ¶ 5fi-iii). After describing the photographs, Defreitas attested that, in his opinion, "such images depict minors engaged in sexually explicit conduct based on the lascivious exhibition of their genitals." (*Id.* ¶ 5g).

The affidavit concluded with extensive information about characteristics common to consumers of child pornography and Defreitas's ultimate conclusion that there was probable cause to believe that evidence, fruits, and instrumentalities of violations of 18 U.S.C. § 2252A would be located at Scanzani's residence.

Based on the application, Magistrate Judge Cabell issued a warrant to search Scanzani's

apartment on June 27, 2018.[3]  The warrant authorized agents to search the "SUBJECT

PREMISES," which consisted of "only Apartment/Unit 1 at 85 Andover Street, Peabody, MA,

and any appurtenances to the real property located at 85 Andover Street, Peabody, MA,

including the attached garage, and any storage unites and outbuildings thereto."  (Warrant at 4).

The warrant further provided that "[t]he SUBJECT PREMISES does not include the vacant unit

or the other rented unit" at 85 Andover Street.  (*Id.* at 5).

The warrant authorized the seizure of "[a]ll records, in whatever form, and tangible

objects that constitute evidence, fruits, or instrumentalities of 18 U.S.C. § 2252A," including

"records and tangible objects pertaining" to "child pornography and child erotica" and to

"communications with any other person that relates to the sexual exploitation of children."  (*Id.*

at 6).  The warrant also authorized seizure of various types of evidence related to "computer

equipment," one of which was "evidence indicating the computer user's state of mind as it

related to the crime under investigation."  (*Id.*).

On July 3, 2018, agents executed the warrant and seized a cell phone, laptop, USB thumb

drive, camera, SD card, and computer from Scanzani's apartment.  (*Id.* at 3).  The thumb drive

contained images of naked children, including the three images Defreitas had submitted to the

magistrate judge.  The SD card contained deleted images depicting young children in suggestive

poses, some of whom were naked.

During the search, agents came across an attic at the top of a flight of stairs located

outside a door to Scanzani's bedroom.  The door to the attic was locked.  After telling agents that

he had sole control of the attic, Scanzani identified the key to unlock the door.  The agents then

---

[3] Scanzani lived in one unit of a multi-level three family home.  The warrant did not authorize a search of the other units.  (Warrant at 4).

searched the attic, where they found a handwritten copy of the "narrative story" that had been captured on RemoteCOM. Agents also found a second copy of the story on Scanzani's desk in his apartment. That copy had been printed in the same font as the image captured by RemoteCOM and also included handwriting.

On August 2, 2018, Scanzani was indicted for possession of child pornography in violation of 18 U.S.C. § 2252A(a)(5)(B).

## II.    <u>Analysis</u>

Scanzani contends (1) that the warrant application did not establish probable cause; (2) that Defreitas "omitted material information critical to the magistrate's determination of whether to issue the search warrant," and that a *Franks* hearing is necessary to "determine whether [Defreitas] omitted the information with an intent or reckless disregard to mislead the magistrate"; (3) that the warrant was unconstitutionally overbroad; (4) that seizure of the physical copies of the narrative story exceeded the scope of the warrant; and (5) that the agents were not authorized to search the attic.

### A.    <u>Whether the Search Required a Warrant</u>

The first issue is whether the government was required to obtain a warrant at all, in light of the fact that Scanzani was subject to warrantless searches as a condition of his supervised release.

"To be valid under the Fourth Amendment, a search must be 'reasonable.'" *United States v. Graham*, 553 F.3d 6, 15 (1st Cir. 2009) (quoting *United States v. Knights*, 534 U.S. 112, 119 (2001)). "Typically, to be considered reasonable a search of a home must be supported by probable cause and be executed pursuant to a particularized warrant authorizing the search." *Id.* "However, there are exceptions to the probable cause and warrant requirements, as the

reasonableness of any search is ultimately determined by examining the 'totality of the circumstances' and balancing on one hand 'the degree to which [the search] intrudes upon an individual's privacy' and on the other 'the degree to which [the search] is needed for the promotion of legitimate government interests." *Id.* (quoting *Knights*, 534 U.S. at 118-19).

In *Knights*, the Supreme Court upheld a warrantless search of the residence of a person who had been placed on probation, where one of the conditions was that he would submit to a warrantless search at any time by any probation officer or law enforcement officer. 534 U.S. at 114. The court upheld the search based on the totality of the circumstances, "with the probation search condition being a salient circumstance." *Id.* at 118. The court noted the fact that the probationer had a "significantly diminished" reasonable expectation of privacy, and that the state had an interest in "apprehending violators of the criminal law" that "justifiably" permitted it to "focus on probationers in a way that it does not on the ordinary citizen." *Id.* at 119-21. It then held that "the balance of these considerations requires no more than reasonable suspicion to conduct a search of this probationer's house." *Id.* at 121. It further noted that it did "not decide whether the probation condition so diminished, or completely eliminated, [Knights's] reasonable expectation of privacy (or constituted consent)." *Id.* at 120 n.6. *See Graham*, 553 F.3d at 15-18 (applying *Knights* in the context of a warrantless search of a state probationer's apartment).[4]

Here, condition (h) of Scanzani's conditions of supervised release clearly and unambiguously provided for warrantless searches of his property upon "reasonable suspicion." And there is no question that law enforcement had an objectively reasonable basis to suspect

---

[4] It is true that *Graham* involved a defendant on probation rather than supervised release. However, the First Circuit made clear that its reasoning applied to all "forms of conditional release," including "[p]robation, parole and supervised release." *Graham*, 553 F.3d at 11, n. 2; *see also United States v. Weikert*, 504 F.3d 1, 7 & n.4 (1st Cir. 2007) (acknowledging that the Supreme Court has analyzed the constitutionality of laws targeted at individuals on "conditional release," to include "[p]robation, supervised release, and parole" as "different forms of conditional release from prison.")

Scanzani possessed child pornography when the search was executed. Nonetheless, Scanzani contends that the ordinary requirements of the Fourth Amendment still apply, notwithstanding the conditions of supervised release.

First, Scanzani contends that "[a]fter deciding to pursue and execute a warrant, the government cannot bypass the Fourth Amendment by invoking an alternate source of authorization." (Reply Mem. at 11). But it would be an odd, and indeed unfortunate, result if a law enforcement officer's decision to apply for a warrant acted as a waiver of that officer's authority to conduct a warrantless search. Law enforcement officers should be encouraged to seek warrants, particularly in doubtful circumstances. If the rule were as defendant proposes, an officer might decline to seek a warrant in order to avoid a possible waiver, which is hardly a desirable outcome. And it is difficult to see what public policy would be served by putting officers in a worse position if they apply for, and obtain, a warrant, than if they had never applied at all.

Second, Scanzani contends that condition (h) is so "vague" that he was not put "on notice of what rights he was forgoing." (*Id.*). "[A] condition of supervised release violates due process . . . if it "either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application." *United States v. Lee*, 315 F.3d 206, 214 (3d Cir. 2003). Condition (h) does not forbid Scanzani from doing anything. And to the extent it requires him to do anything, what it requires is not beyond common understanding. It clearly states that he was required to submit to "examinations" of his property at any time that a law enforcement officer has "reasonable suspicion" that he engaged in "unlawful conduct" or violated one of his conditions. Because

that requirement is reasonably clear, the condition did not violate his right to due process.[5]

Third, Scanzani appears to contend that even if his conditions of supervised release permitted the search of his apartment, the conditions did not permit agents to seize the physical copy of his narrative story. In particular, he points to the language of condition (h) that any search may "include the retrieval and copying all data from the computer(s)," from which he argues that the agents were authorized to seize (or retrieve and copy) *only* data from his computers. That argument, however, misreads condition (h); the condition does not limit what agents were allowed to seize, but rather provides explicitly that agents were permitted (among other things) to retrieve and copy that data. Furthermore, condition (h) makes clear that agents were permitted to search both Scanzani's "residence" and "papers." And once the agents did so, and discovered the copies of Scanzani's narrative story, they possessed probable cause sufficient to justify the seizure.

Accordingly, because the conditions of Scanzani's release clearly and unambiguously permitted a search of his apartment based on reasonable suspicion of unlawful conduct, and because law enforcement had an objectively reasonable basis to suspect that he possessed child pornography, the search did not require a warrant. In an abundance of caution, however, the Court will address each of his remaining contentions.

### B.     Whether the Warrant Was Supported By Probable Cause

Scanzani contends that the search warrant application failed to establish probable cause, and therefore the Court should suppress the evidence obtained pursuant to the search warrant in its entirety. (Def. Mem. at 12). In particular, he contends that the three images Defreitas

---

[5] Scanzani also contends that condition (h) is "confus[ing]" because it is in "tension" with conditions (b) and (c). It is true, as Scanzani points out, that conditions (b) and (c) permit searches only by probation officers, while condition (h) permits searches by both "any law enforcement officer *or* [any] probation officer." Scanzani has not shown, however, how that distinction makes condition (h) unclear or beyond common understanding.

submitted with his application do not depict "lascivious exhibition[s] of the anus, genitals, or pubic area of any person" under 18 U.S.C. § 2256(2)(A)(v), and that the narrative story mentioned in the affidavit consists of "protected speech that does not support a finding of probable cause of criminal activity."

"Probable cause 'is not a high bar.'" *District of Columbia v. Wesby*, 138 S. Ct. 577, 586 (2018) (quoting *Kaley v. United States*, 571 U.S. 320, 338 (2014)). Instead, "[p]robable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Illinois v. Gates*, 462 U.S. 213, 243, n. 13 (1983).

A magistrate judge undertaking a probable-cause determination must "make a practical, common-sense decision" based on "all of the circumstances set forth in the affidavit before him." *Id.* at 238. In other words, "probable cause determinations are to be informed by the totality of the circumstances and not by the consideration of different pieces of evidence in isolation." *United States v. Anzalone*, 923 F.3d 1, 4 (1st Cir. 2019). A reviewing court must "give significant deference to the magistrate judge's initial evaluation" and may "revers[e] only if [it] see[s] no 'substantial basis' for concluding that probable cause existed." *United States v. Cordero-Rosario*, 786 F.3d 64, 69 (1st Cir. 2015) (quoting *United States v. Ribeiro*, 397 F.3d 43, 48 (1st Cir. 2005).

Thus, whether probable cause existed turned not simply on the nature of the images presented by Defreitas, but rather on an analysis that considered the totality of the circumstances. Those circumstances, among other things, also included the facts that Scanzani had at least edited the narrative story and that he was on supervised release for a prior child-pornography conviction. *See United States v. Wagers*, 452 F.3d 534, 541 (6th Cir. 2006) (concluding that a defendant's prior conviction for child pornography was "relevant" to determination of probable

cause). And even considering the images submitted by Defreitas in isolation, there was more than a substantial basis for a finding of probable cause.

### 1.     <u>Whether the Photographs Were a "Lascivious Exhibition"</u>

Section 2256(8)(A) defines child pornography as "any visual depiction . . . of sexually explicit conduct, where . . . the production of such visual depiction involves the use of a minor engaging in sexually explicit conduct." 18 U.S.C. § 2256(8)(A). "Sexually explicit conduct" includes the "lascivious exhibition of the genitals or pubic area of any person." 18 U.S.C. § 2256(2)(A)(v).

Relying entirely on the so-called *Dost* factors, Scanzani essentially argues that the images submitted to the magistrate judge "satisf[ied] only one or, at best, two" of the factors, and that therefore the images were not "lascivious," within the meaning of the law. *See United States v. Dost*, 636 F. Supp. 828, 832 (S.D. Cal 1986).[6] But while the *Dost* factors are relevant to determining whether an image constitutes child pornography, because "[l]ascivious is a commonsensical term . . . there is no exclusive list of factors . . . that must be met for an image . . . to be lascivious." *United States v. Charriez-Rolón*, 923 F.3d 45, 52 (1st Cir. 2019) (internal quotation omitted). "When images . . . show young [children] . . . fully nude and

---

[6] The *Dost* factors are:

(1) Whether the focal point of the visual depiction is on the child's genitalia or pubic area;

(2) Whether the setting of the visual depiction is sexually suggestive, i.e. in a place or pose generally associated with sexual activity;

(3) Whether the child is depicted in an unnatural pose, or in inappropriate attire, considering the age of the child;

(4) Whether the child is fully or partially clothed, or nude;

(5) Whether the visual depiction suggests sexual coyness or a willingness to engage in sexual activity; [and]

(6) Whether the visual depiction is intended or designed to elicit a sexual response in the viewer.

636 F. Supp. at 832.

engaging in activities that display their genitalia in a manner that . . . a jury reasonably could deem to be intended to sexually arouse the viewer[,] that is enough to show that the images are lascivious." *Id.* at 53 (internal quotation omitted). That standard is clearly met here.

The first image depicts what appears to be two blurry screen shots of the lower half of a naked infant boy. The boy appears to be lying on some type of blanket, with his legs spread, revealing his genitalia. The images are zoomed in on the genitals so that they constitute the center or focus of the image.

The second image depicts a prepubescent naked boy with his legs spread apart sitting on what appears to be a barrel or drum. The image shows the child's entire body and his genitals are clearly exposed. He is holding a half-eaten banana in his right hand, and he is looking directly in to the camera.

The third image is somewhat blurry and depicts a baby boy lying on his side, with his clothes positioned in a way that reveals his bare stomach and naked bottom half, including his genitals. The image does not show the baby's face.

The images depict fully or partially nude children whose genitals are displayed in a manner that a jury could reasonably deem was intended to sexually arouse the viewer. In addition, because "[t]he settings of the photographs provide no ready explanation that makes the nudity indisputably innocent," the Court has no difficulty in concluding that the images constitute child pornography as defined by the statute. *United States v. Frabizio*, 459 F.3d 80, 86 (1st Cir. 2006).

### 2.      Whether the Narrative Story Was Protected Speech

Scanzani further argues that because the narrative story was protected speech, it could not have established probable cause that he was violating the law. He relies primarily on the Tenth

Circuit case of *United States v. Edwards*, 813 F.3d 953 (10th Cir. 2015). *Edwards*, however, is plainly distinguishable.

In *Edwards*, a magistrate judge had issued a search warrant based on three things: (1) the defendant's "possession and sharing of child erotica" on a website; (2) a "law-enforcement officer affiant's opinion that people who possess child pornography are also likely to possess child erotica;" and (3) "sexually suggestive comments about the child in the photographs" that the defendant had posted on the website. In concluding that the search warrant had not been supported by probable cause, the Tenth Circuit noted "the danger of assuming that legal conduct *standing alone* suggests the actor is also inclined to engage in criminal conduct." *Id.* at 964. (emphasis added).

The circumstances here are entirely different. Unlike Scanzani, the defendant in *Edwards* did not have a prior conviction for possessing child pornography. And the images that were presented to the magistrate judge here were not mere child erotica, but rather child pornography. The narrative story therefore did not "stand alone" in the evidentiary calculus. And because a defendant's possession of material involving the sexual molestation of children—even if the material is legal, and regardless of whether the material constitutes child pornography—can have significant probative value, it was entirely appropriate for the magistrate judge to consider the story in making his probable-cause determination. *United States v. Vosburgh*, 602 F.3d 512, 538 (3d Cir. 2010).

Accordingly, the magistrate had a substantial basis for concluding that probable cause existed.

### C.    Whether a *Franks* Hearing Is Required

Scanzani next contends that the warrant affidavit was deficient because Defreitas failed to

inform the magistrate judge that Scanzani's probation officers and psychologist "had known about the narrative story for some time" and had not "acted to sanction or penalize" him. Without that information, he contends, the magistrate judge had not been "allow[ed] . . . to make an independent evaluation of the matter." Accordingly, he seeks a *Franks* hearing to determine whether Defreitas "omitted the information with an intent or reckless disregard to mislead the magistrate." See *Franks v. Delaware*, 438 U.S. 154 (1978).

To be entitled to a *Franks* hearing, a defendant must make a "substantial preliminary showing" of two things. *United States v. Arias*, 848 F.3d 504, 511 (1st Cir. 2017) (internal quotations omitted). First, the defendant must show that "a false statement or omission in the affidavit was made knowingly and intentionally or with reckless disregard for the truth." *Id.* "Recklessness may be inferred directly from the fact of omission only if the omitted information was *critical* to the probable cause determination." *United States v. Tanguay*, 787 F.3d 44, 49 (1st Cir. 2015) (internal quotation omitted). Second, the defendant must show "that the false statement or omission was necessary to the finding of probable cause." *Arias*, 848 F.3d at 511.

Scanzani cannot satisfy the first requirement here, as he has not made any showing that Defreitas was even aware of the fact that his probation officer and psychologist had known about the story. Furthermore, and in any event, the fact that probation and the psychologist knew of the story without sanctioning him was hardly critical to the magistrate judge's probable-cause determination. And there is no reason to believe that probation and the psychologist were aware of the images of naked children that Defreitas submitted with his affidavit.

Accordingly, Scanzani has not made the preliminary showing necessary to obtain a *Franks* hearing.

### D. **Whether the Warrant Was Overbroad**

Scanzani next contends that the search warrant was unconstitutionally overbroad, and thus amounted to a general warrant.

"General warrants authoriz[ing] the wholesale rummaging through a person's property are invalid." *United States v. Kuc*, 737 F.3d 129, 133 (1st Cir. 2013) (internal quotation omitted). "[A] valid warrant: (1) must supply enough information to guide and control the executing agent's judgment in selecting where to search and what to seize; and (2) cannot be too broad in the sense that it includes items that should not be seized." *Id.* (internal quotation omitted). "The proper metric of sufficient specificity is whether it was reasonable to provide a more specific description of the items at that juncture of the investigation." *United States v. Meek*, 366 F.3d 705, 716 (9th Cir. 2004). Here, Scanzani contends that two of the items specified on the warrant as subject to seizure were impermissibly vague and overbroad.

#### 1. **"Child Erotica"**

First, Scanzani takes issue with the warrant's authorization to seize "[r]ecords and tangible objects pertaining to [c]hild pornography and child erotica." Essentially, he contends that the term "child erotica" is so broad that it provides no meaningful guideposts for the agents, and thus permitted them to seize a wide array of protected material. Relying on the Seventh Circuit case of *United States v. Hall*, he argues that "where law enforcement's purpose is to seize material presumptively protected by the First Amendment, the items to be seized must be described in the warrant with increased particularity." 142 F.3d 988, 996 (7th Cir. 1998) (citing *Marcus v. Search Warrants*, 367 U.S. 717, 731 (1961)).

Courts have frequently held that warrants authorizing the seizure of child erotica, in combination with child pornography, are sufficiently specific. For example, in *United Sates v.*

*Banks*, 556 F.3d 967, 973 (9th Cir. 2009), a case involving the search of the home of a man who was suspected to possess child pornography, the Ninth Circuit held that a warrant authorizing the seizure of a "range of items containing a connection to 'child pornography,' 'child erotica,' or 'minors engaged in sexually explicit conduct' . . . was sufficiently particular." Similarly, in *United States v. Campos*, 221 F.3d 1143, 1147 (10th Cir. 2000), the Tenth Circuit held that a warrant "authoriz[ing] [] agents to seize computer equipment which may be, or [is] used to visually depict child pornography, child erotica, information pertaining to sexual activity with children or the distribution, possession, or receipt of child pornography, child erotica or information pertaining to an interest in child pornography or child erotica," was "not . . . overly broad." *See also United States v. Hall*, 142 F.3d 988, 996-97 (7th Cir. 1998) (finding warrant sufficiently particular "because the items listed on the warrants were qualified by phrases that emphasized that the items sought were those related to child pornography."); *United States v. Lamb*, 945 F. Supp. 441, 463 (concluding that the term "child erotica" was "sufficiently particular" and "properly the subject of a search for evidence of" child pornography possession because "such evidence [was] relevant to the questions of [the] defendant's predisposition or lack of mistake concerning the outlawed materials.").

The Court finds the *Campos* case to be persuasive, and will adopt its analysis here. Scanzani has therefore not shown that the warrant's authorization to seize material related to "child erotica" was improper.

### 2. **"State of Mind" Evidence**

Scanzani also contends that the provision of the warrant that authorized agents to seize, "[f]or any . . . computer equipment," evidence "indicating [the] [] user's state of mind as it relates to the crime under investigation," is vague and overbroad.

In response, the government cites to only one case, *United States v. Manafort*, for the proposition that "courts have rejected challenges to warrants that . . . broadly authorize seizure of evidence related to a defendant's state of mind." 323 F. Supp. 3d 795, 803 (E.D. Va. 2018). The court in *Manafort*, in turn, cites to only one case in support of that statement, *United States v. Tsarnaev*, 53 F. Supp. 3d 450 (D. Mass. 2014).

In *Manafort*, although the court did state that courts have rejected particularity challenges to warrants authorizing the seizure of "state of mind" evidence, it made clear that the reason courts have done so is because "evidence relevant to establish a defendant's state of mind at the time he allegedly committed fraud-related crimes . . . can often come from records and evidence separate from, and unrelated to, the allegedly criminal transactions themselves." 323 F. Supp. 3d at 803 (emphasis added).

*Tsarnaev*, however, was not a case involving a fraud-related crime. There, the warrant in question had provided a list of 13 types of evidence that were authorized to be seized. One item on the list authorized seizure of "[p]roperty, records, or information related to the state of mind and/or motive of [the defendant and his brother] to undertake the Boston Marathon bombings." *Id.* at 455. And although the court concluded that the warrant satisfied the particularity requirement, it noted that the "defendant's argument" had been "that some of the enumerated categories, particularly" items "8 through 12" of the warrant—none of which concerned state of mind evidence—were phrased too "broadly." *Id.* at 456. It is unclear, therefore, to what extent the court in *Tsarnaev* even considered the warrant's authorization to seize "state of mind" evidence.

Notwithstanding *Manafort* and *Tsarnaev*, the use of the term "state of mind" evidence is troubling, and it is far from clear whether the term is sufficiently specific to provide appropriate

guidance to the executing agents.  With the possible exception of an actual admission by a target, "state of mind" evidence is always indirect or circumstantial.  And while possession of child pornography or child erotica is clearly evidence of the state of mind of the target, it is much less clear what else would qualify.  For example, adult pornography or non-pornographic images of children might qualify, but reasonable persons could also conclude that they do not.[7]

In any event, it is unnecessary, for present purposes, to conclude whether the "state of mind" provision was sufficiently particular.  Scanzani contends that if the Court finds the provision vague and overly broad, it should suppress the portions of the story that did not appear in the RemoteCOM screenshots, or any physical copies of the story.  But when only part of a warrant is overbroad, suppression may be limited to items seized under those categories and not items seized under the entire warrant.  *Id.* at 457 (citing *United States v. Morris*, 977 F.2d 677, 682 (1st Cir. 1992)).  It is unclear under which provision the agents seized the documents in question.  But even Scanzani acknowledges that in addition to the "state of mind" provision, the agents could have seized the documents under the "child erotica" provision of the warrant.  And because that provision satisfied the particularity requirement, the seizure of the items under that category was appropriate.  Accordingly, even if the "state of mind" provision was impermissibly broad (and even assuming a warrantless search were not permitted), suppression of the evidence is not required.

### E.    Whether the Warrant Authorized Seizure of the Stories

Scanzani next contends that the agents' seizure of the physical copies of his narrative story exceeded the scope of the warrant.

---

[7] It also appears to be unnecessary, from a practical standpoint, for law enforcement to seek authorization for seizure of "state of mind" evidence.  If, for example, the agents wished to seize adult pornography or non-pornographic images of children, it would have been easy enough to say so.

First, he contends that the physical copies of the story do not qualify as "[r]ecords and tangible objects pertaining to . . . child erotica," because, according to Scanzani, "child erotica" is typically understood to mean images and not written words. He cites a number of cases where courts have referred to images of naked children as "child erotica." From this, he contends that the phrase "generally" covers only images, and that because the warrant here "did not provide a more specific definition" of the phrase, the typical definition should control. (Def. Mot. at 27).

The fact that some cases have referred to photographic images as "child erotica" does not mean that written words *cannot* be child erotica. *See, e.g., United States v. Piccininno*, 2018 WL 5492517 (C.G. Ct. Crim. App. Oct. 30, 2018); *United States v. Gourde*, 440 F.3d 1065 (9th Cir. 2006); *United States v. Townsend*, 649 Fed. App'x. 189 (3d Cir. 2016). Indeed, "erotica" itself is commonly defined so as to include the written word; popular dictionaries define erotica as "literary or artistic works having an erotic theme or quality," and "books, pictures, etc. that produce sexual desire and pleasure." Merriam-Webster, www.merriam-webster.com/dictionary/erotica; Cambridge English Dictionary, www.dictionary.cambridge.org/us/dictionary/english/erotica.

In addition, and more importantly, the warrant itself makes clear that agents were authorized to seize "[a]ll records, *in whatever form* . . . that constitute evidence, fruits, or instrumentalities of 18 U.S.C. § 2252A, including . . . [r]ecords and tangible objects pertaining to . . . child erotica." (emphasis added).

Accordingly, the physical copies of Scanzani's narrative story constituted a "record pertaining" to child erotica as provided by the warrant.

### F.     The Search of the Attic Was Permissible

Finally, Scanzani contends that the warrant did not authorize the agents to search his

attic, and thus the handwritten copy of his narrative story, which agents seized from his attic, should be suppressed.

As noted, the warrant authorized the search of "only Apartment/Unit 1 at 85 Andover Street, Peabody, MA and any appurtenances to the real property located at 85 Andover Street, Peabody, MA, including the attached garage, and any storage units and outbuildings thereto." (Warrant at 4). Scanzani contends that the attic was not an "appurtenance" to the property, because it is generally understood that "appurtenance refers to outer appendages," or the "extension of the exterior of the building." (Def. Mot. at 29).

The standard to be applied is one of "objective reasonableness." *United States v. Fagan*, 577 F.3d 10, 13 (1st Cir. 2009). Therefore, the question is not whether the attic *in fact* constituted an appurtenance to the property, but rather whether "the officers executing the warrant [had] an objectively reasonable basis, in light of the known characteristics of the location and the evidence at hand, for concluding" that it was an appurtenance. *Id.*

That inquiry—that is, "whether a searching officer reasonably could conclude" that something was "appurtenant to the premises specified in a particular search warrant necessarily demands close attention to the facts incident to the search in question." *Id.* at 14. Although "each instance is likely to be sui generis," the First Circuit has provided some "helpful guideposts," including an area's "proximity . . . to the described premises," the "location's layout and the context-specific relationship between the [area] and the premises," and "extrinsic evidence, including evidence discovered during admittedly valid portions of the search." *Id.*

Scanzani argues that the attic was "not close or connected" to his apartment. But he does not contest the government's description of the stairs to the attic as being located "just a few steps outside a door to [his] bedroom," nor the government's contention that he told agents that

he had "exclusive use and control of the attic" and that he "identified on his key ring the key to the attic door, which was at the top of the stairs."

Under the circumstances, the agents executing the warrant had more than a reasonable basis for concluding Scanzani's attic was covered by the warrant. Scanzani has not shown that the agents' conclusion, under the circumstances, was objectively unreasonable. Accordingly, the Court cannot conclude that the search of the attic surpassed the scope of the warrant, and thus it will not suppress the handwritten story seized by the agents.

## III.    Conclusion

For the foregoing reasons, the motion to suppress is DENIED.

**So Ordered.**

/s/  F. Dennis Saylor
F. Dennis Saylor IV
Dated:  August 15, 2019                    United States District Judge